In re ACTIVISION BLIZZARD, INC.
Stockholder Litigation.

C.A. No. 8885–VCL.

Court of Chancery of Delaware.

Submitted: Feb. 11, 2014.
Decided: Feb. 21, 2014.

Joel Friedlander, Jeffrey M. Gorris, Albert J. Carroll, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Jessica Zeldin, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Lawrence P. Eagel, Jeffrey H. Squire, Bragar Eagel & Squire, PC, New York, New York; Attorneys for Plaintiff.

Raymond J. DiCamillo, Susan M. Hannigan, Richards, Layton & Finger, P.A., Wilmington, Delaware; Joel A. Feuer, Michael M. Farhang, Alexander K. Mircheff, Gibson, Dunn & Crutcher LLP, Los Angeles, California; Attorneys for Defendants Vivendi S.A., Philippe Capron, Frédéric Crépin, Régis Turrini, Lucian Grainge, Jean–Yves Charlier, and Jean–François Dubos.

R. Judson Scaggs, Jr., Shannon E. German, Angela C. Whitesell, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Robert A. Sacks, Diane L. McGimsey, Sullivan & Cromwell LLP, Los Angeles, California; William H. Wagener, Sullivan & Cromwell LLP, New York, New York; Attorneys for Defendants Robert A. Kotick, Brian G. Kelly, ASAC II LP, and ASAC II LLC.

Collins J. Seitz, Jr., Garrett B. Moritz, Anthony A. Rickey, Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; William Savitt, Ryan A. McLeod, Wachtell, Lipton, Rosen & Katz, New York, New York; Attorneys for Defendants Robert J. Corti, Robert J. Morgado, and Richard Sarnoff.

Edward P. Welch, Edward B. Micheletti, Sarah Runnells Martin, Lori W. Will, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Attorneys for Nominal Defendant, Activision Blizzard, Inc.

## OPINION

LASTER, Vice Chancellor.

Plaintiff Anthony Pacchia has challenged a transaction through which Activision Blizzard, Inc. ("Activision" or the "Company") and an entity controlled by Activision's two senior officers acquired over 50% of the Company's outstanding shares from Vivendi S.A., its controlling stockholder, for approximately $8 billion in cash. The plaintiff contends that Vivendi and the members of the Activision board of directors (the "Board") breached their fiduciary duties by entering into the transaction. Six of the eleven individual defendants who served on the Board and approved the transaction were senior officers of Vivendi (the "Vivendi Directors").

In response to document requests that the plaintiff served, Vivendi objected generally on the grounds that French law barred the production of discovery (i) except pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Evidence Convention") and (ii) unless electronic documents were handled in accordance with French Law No. 78–17 of January 6, 1978 on Information Technology, Data Files and Civil Liberties (the "Data Protection Act"). With one exception, the Vivendi Directors joined in this objection. The exception was a Vivendi Director who lives in California and who agreed to search for and produce responsive documents located in the United States. Vivendi similarly offered to produce files located in the United States, but cautioned that all of its electronic documents were housed on servers in Paris, France, and could not be produced.

The plaintiff has filed a motion to compel seeking an order requiring Vivendi and the Vivendi Directors (together, the "Vivendi Defendants") to produce documents in their possession, custody, and control, wherever located, in accordance with the Court of Chancery Rules and without regard to any contrary provisions of French law (the "Motion to Compel"). The Motion to Compel also seeks a ruling that depositions will be conducted in the United States in accordance with the Court of Chancery Rules. The Vivendi Defendants ask that the motion be denied and a protective order be entered providing that discovery only proceed in conformity with the Evidence Convention and that any pro-

duction of electronic information comply with the Data Protection Act.

The Motion to Compel is largely granted. Discovery shall proceed as described in this decision.

## I. FACTUAL BACKGROUND

The facts for purposes of the Motion to Compel are drawn from the allegations of the Verified Second Amended Class and Derivative Complaint (the "Complaint") and the exhibits, affidavits, and declarations submitted with the briefing on the Motion to Compel. What follows are not formal factual findings, but rather how the court views the record for purposes of a discovery ruling.

### A. Activision And Vivendi

Activision is a Delaware corporation with its headquarters in Santa Monica, California. Its stock is listed on Nasdaq under the symbol "ATVI." The Company is a leading player in the interactive entertainment software industry and one of the largest video game publishers in the United States.

Vivendi is a *société anonyme* organized under the laws of France with its headquarters in Paris, France. Vivendi is a French multinational mass media and telecommunication company that operates in the music, television and film, publishing, telecommunications, the Internet, and video games sectors. Vivendi has experience litigating in the United States. In addition to the current litigation, it has been a plaintiff at least four times [1] and named a defendant at least twice.[2]

---

1. *See Vivendi S.A. v. T–Mobile,* 2:06–cv–01524 (W.D.Wash.); *Vivendi S.A. v. AXA Ins. Co.,* 2:09–cv–08893 (C.D.Cal.); *Vivendi Universal S.A. v. USANi Sub LLC,* C.A. No. 319–N (Del. Ch.); *Vivendi Universal, S.A. v. Echostar Comm. Corp.,* 1:05–cv–00225 (S.D.N.Y.).

2. *See In re Vivendi Universal S.A. Sec. Litig.,* 1:02–vc–05571 (S.D.N.Y.); *Wayne Cty. Empls.' Retire. Sys. v. Corti,* C.A. No. 3534–CC (Del.Ch.).

On December 1, 2007, Activision, Vivendi, and certain of their wholly owned subsidiaries entered into a business combination agreement (the "Business Combination Agreement" or "BCA"). Pursuant to the BCA, Activision acquired a Vivendi subsidiary, Vivendi Games, Inc., in exchange for issuing 295.3 million shares of Activision common stock to a different Vivendi subsidiary, VGAC LLC. In addition, Activision issued 62.9 million shares of its common stock to Vivendi for approximately $1.7 billion. This decision refers to the transaction as the "Business Combination."

The Business Combination closed in 2008. As part of the transaction, Vivendi gained the right to appoint six directors to the eleven-member Board.

## B. The Challenged Transaction And This Litigation

On July 25, 2013, Activision, Vivendi, and defendant ASAC II LP ("ASAC") entered into a stock purchase agreement (the "Stock Purchase Agreement" or "SPA"). Pursuant to the SPA, Activision agreed to purchase a Vivendi subsidiary for $5.83 billion, and ASAC agreed to purchase 171,-968,042 shares of Activision common stock from Vivendi at $13.60 per share. ASAC is an entity controlled by defendants Robert Kotick and Brian Kelly, the Company's two most senior executives. The transaction closed in October 2013. This decision refers to that transaction as the "Restructuring."

During the time when the Restructuring was being negotiated, and when it was approved, the Vivendi Directors who served on the Activision Board were Philippe Capron, Frédéric Crépin, Régis Turrini, Lucian Grainge, Jean–Yves Charlier, and Jean–François Dubos. Each of the Vivendi Directors was a senior executive officer of Vivendi or one of its U.S. subsidiaries.

The Complaint alleges that Vivendi caused Activision to enter into the Restructuring because Vivendi desperately needed liquidity. It alleges that the Vivendi Directors threatened to take actions to generate liquidity for Vivendi if a sale of Vivendi's control position was not promptly achieved. The Complaint asserts that after the Board created a special committee to negotiate with Vivendi, the Vivendi Defendants forced the committee to disband. According to the Complaint, Vivendi then negotiated directly with Kotick and Kelly to structure the Restructuring to their mutual benefit. Through the transaction, Vivendi got the liquidity it needed, Kotick and Kelly got control of Activision, and their investment vehicle, ASAC, got to purchase shares of stock from Vivendi at a discount to the market price. The announcement of the transaction led to an increase in Activision's stock price. As a result of the transaction bump and the discounted price, ASAC had an unrealized gain of over $725 million as of the first day of public trading after the transaction closed. The Complaint alleges that faithful fiduciaries would have sought and obtained a transaction that generated greater value for Activision and its stockholders.

## C. The Document Requests And The Objections

On October 14, 2013, the plaintiff served a first request for production of documents on the Vivendi Defendants. On December 11, the plaintiff served a second request. The document requests call for the Vivendi Defendants to produce documents relating to the Restructuring.

On January 3, 2014, counsel for the Vivendi Defendants emailed the plaintiff's counsel and noted that the Vivendi Defendants would object to producing docu-

ments located in France. Vivendi's counsel took the position that French Statute No. 68–678 of July 26, 1968, as amended in 1980, commonly known as the "Blocking Statute," made it a criminal offense for the Vivendi Defendants to respond to the document requests. *See* Law No. 68–678 of July 26, 1968 relating to the Communication of Economic, Commercial, Industrial, Financial or Technical Documents and Information to Foreign Individuals or Legal Entities, as modified by Law No. 80–538 of July 16, 1980, *available at* Affidavit of Justice Jean–Paul Beraudo ("Beraudo Aff.") Ex. 2. Vivendi's counsel also asserted that the plaintiff only could take discovery from the Vivendi Defendants by using the procedures and abiding by the limitations on discovery set forth in the Evidence Convention. *See* Evidence Convention, *opened for signature* Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 241.

On January 17, 2014, the Vivendi Defendants served formal responses to the plaintiff's document requests. General Objection No. 2 objected to the plaintiff's document requests

> to the extent they seek or call for information or documents located in foreign countries without … complying with any legal prerequisites to production from such foreign jurisdictions, including without limitation (i) the 1970 Hague Evidence Convention; (ii) French Statement n° 68–678 of 26 July 1968 (as amended in 1980) (also sometimes referred to as the "French Blocking Statute") …; and (iii) the French Data Protection Act N° 78–17 of January 6, 1978 as amended in August 2004, governing the processing and transfer of personal data outside France. In light of the competing interests of the nations whose laws are in conflict, the hardship of compliance on the Vivendi Defendants, the relative importance of the information requested compared with in-

formation readily available from parties within the U.S., and the Vivendi Defendants' good faith willingness to provide responsive materials following a reasonable search, any discovery of the Vivendi Defendants should be made in compliance with the foregoing laws. Otherwise, complying with the Document Requests would pose a material risk of criminal liability.

Pl.'s Mot. Compel Ex. D at 3–4 (citations omitted); *accord* Pl.'s Mot. Compel Ex. E at 3–4 (citations omitted). This objection confirmed the Vivendi Defendants' earlier, informal objection based on the Blocking Statute and added an objection based on the Data Protection Act.

### 1. The Blocking Statute

France adopted its initial blocking statute in 1968 as part of the French government's resistance to the antitrust investigations and enforcement actions by the United States government against international shipping cartels. The original statute prohibited the communication, "to foreign public authorities, [of] documents or information relating to carriage by sea defined by Ministerial order issued by the Ministry in charge of the merchant navy." Law No. 68–678 of July 26, 1968 relating to the Communication of Documents and Information to Foreign Authorities in the Field of Maritime Trade, *available at* Beraudo Aff. Ex. 1.

In 1980, the French government adopted the current Blocking Statute, which is more expansive in scope. Article 1 *bis* addresses the gathering of evidence in France. As translated by Vivendi for purposes of the Motion to Compel, it states:

> Without prejudice to international treaties or agreements and laws and regulations in force, it is prohibited for any

person to request, search for or communicate, in writing, orally or in any other form, documents or information of an economic, commercial, industrial, financial or technical nature for the purposes of establishing evidence in view of foreign judicial or administrative proceedings or in relation thereof.

Blocking Statute, art. 1 *bis*. Article 2 requires that persons subject to the Blocking Statute "promptly inform the competent Minister, upon the receipt of any request concerning such communications." *Id.* Article 3 makes a violation of the statute a criminal offense punishable by imprisonment of up to six months and a fine of up to 18,000. *Id.*

By its terms, the Blocking Statute prohibits the collection and production of materials in France for use outside of France in civil discovery, except in compliance with French law or an international convention such as the Evidence Convention. Its application is not limited to responses to document requests. Read literally, it encompasses any attempt by a party to transmit its own evidence outside of France for purposes of a foreign judicial proceeding. "If taken seriously the law would effectively prevent French parties from suing their foreign counterparts, even legitimately, because they could be barred from exporting their supporting evidence." Pierre Grosdidier, *The French blocking statute, the Hague Evidence Convention, and the case law: lessons for French parties responding to American Discovery,* Haynes & Boone, LLP 4 (Jan. 31, 2014), *available at* http://www.haynesboone.com/french_blocking_statute/ (citing *Adidas (Can.) Ltd. v. S.S. Seatrain Bennington,* 1984 WL 423, at *3 (S.D.N.Y. May 30, 1984) (refusing to take law "at face value" as a "blanket criminal prohibition against exporting evidence for use in foreign tribunals")).

As currently applied, the recipient of a request for documents or information prohibited by the Blocking Statute is obligated to inform the Ministry of Foreign Affairs. Beraudo Aff. ¶ 19. Some United States courts have observed that the recipient should be able to seek and obtain a waiver of the statute or some assurance against prosecution. One of Vivendi's experts on French law, Justice Jean–Paul Beraudo, categorically rejects this possibility: "It is not possible to obtain permission to disclose documents, the disclosure of which would otherwise be prohibited by [the Blocking Statute.]" *Id.* ¶ 20.

At least one violation of the Blocking Statute has been prosecuted. *See In re Avocat "Christopher X",* Cour de cassation [Cass.] [Supreme Court for Judicial Matters] Paris, crim., Dec. 12, 2007, No. 07–83228, *available at* Beraudo Aff. Ex. 7 [hereinafter *Christopher X* ]. The *Christopher X* case did not involve compliance with an ordinary discovery request. Instead, a French attorney contacted a witness and sought to elicit information for use in litigation in the United States by making false suggestions about what the evidence would show. The witness responded by disputing the false account and confirming his view in writing. The attorney then used the written statement in the U.S. case. The Criminal Chamber of the French Supreme Court affirmed the attorney's conviction for violation of the Blocking Statute and the imposition of a criminal sanction of 10,000. *Id.; accord* Beraudo Aff. ¶ 26.

## 2. The Evidence Convention

The language of the Blocking Statute does not apply to parties' efforts to take evidence in France under any "international treaties or agreements and [the] laws and regulations in force." Blocking Statute, art. 1 *bis*. Both the United States and

France are parties to the Evidence Convention.

The Evidence Convention identifies two primary mechanisms for obtaining evidence located abroad. The first method is a Letter of Request sent by a court in the requesting state. Evidence Convention, art. 1 ("[A] judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act."). Article 3 of the Evidence Convention identifies items that the Letter of Request should contain, including, where appropriate "the questions to be put to the persons to be examined or a statement of the subject-matter about which they are to be examined" and "the documents or other property, real or personal, to be inspected." *Id.* art. 3(f)-(g). When responding to a Letter of Request, the recipient judicial authority "shall apply its own law as to the methods and procedures to be followed." *Id.* art. 9. The Evidence Convention contemplates, however, that the recipient judicial authority "will follow a request of the requesting authority that a special method or procedure be followed, unless this is incompatible with the internal law of the State of execution or is impossible of performance by reason of its internal practice and procedure or by reason of practical difficulties." *Id.* Article 9 states that "[a] Letter of Request shall be executed expeditiously." *Id.*

The second method authorizes diplomatic officers, consular agents, or appointed commissioners of the requesting state to collect evidence. *Id.* arts. 15–17. Under these provisions, the collection of evidence must conform to the laws of the requested state. *Id.* art. 21.

Article 23 of the Evidence Convention provides that "[a] Contracting State may at the time of signature, ratification or accession, declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." *Id.* art. 23. When acceding to the Evidence Convention in 1974, France declared pursuant to article 23 that "Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries will not be executed." Beraudo Aff. ¶ 35. The 1974 declaration effectively prevented discovery in France except pursuant to the commissioner method and in compliance with French law.

In 1987, the French authorities modified their declaration by stating that

> [t]he declaration made by the French Republic in accordance with Article 23 relating to Letters of Request issued for the purpose of obtaining pretrial discovery of documents does not apply when the requested documents are enumerated limitatively in the Letter of Request and have a direct and precise link with the object of the procedure.

*Id.* Justice Beraudo states that the 1987 declaration is "applied practically." *Id.* ¶ 36. He says that French authorities will accommodate a Letter of Request that contains "a general presentation of the dispute, explaining why the documents are requested." *Id.* He further states that French authorities understand "that the requesting party's knowledge of the documents is incomplete" and do not require an exact description. *Id.* Justice Beraudo opines that the plaintiff's document requests meet the applicable standards, with the exception of items 14 and 15 of the plaintiff's second request for production. During oral argument, Vivendi agreed and

represented that it would not argue to the contrary before any French authority.

### 3. The Data Protection Act

The Data Protection Act reflects France's interest in protecting the privacy rights of individuals. It codifies a data privacy regime established by the European Union, which considers the privacy of personal data to be part of the "fundamental rights and freedoms of natural persons." Directive 95/46/EC of the European Parliament and of the Council of Europe of 24 October 1995 concerning the Protection of Individuals with Regard to Processing of Personal Data and the Free Circulation of Such Data, art. 1, *available at* Defs.' Opp'n Mot. Compel Ex. 3 [hereinafter European Directive]; Data Protection Act, art. 1, *available at* Defs.' Opp'n Mot. Compel Ex. 15. European Union members are required to afford "privacy with respect to the processing of personal data." European Directive, art. 1.

The Data Protection Act prohibits the disclosure of "personal data," which is broadly defined, and requires that certain limiting steps be taken to minimize the gathering and disclosure of personal data. *See generally* Declaration of Florence Chafiol–Chaumont (the "Chafiol–Chaumont Decl."). Key among these procedures is the requirement that data requests be tailored in accordance with the Data Protection Act's "proportionality" principle. This principle requires that only such information as is "relevant and necessary" to the litigation be gathered and that access to non-relevant personal data be minimized through closely circumscribed keyword searches and other data searching tools. Chafiol–Chaumont Decl. ¶¶ 13–14. Personal data must be redacted or replaced with pseudonyms wherever possible. *Id.* ¶¶ 13, 15.

For litigation in the United States, a confidentiality stipulation or protective order must be used to ensure that appropriate privacy protection measures are taken to protect the data privacy rights of persons identified in the materials produced. *Id.* ¶ 21–22. These measures include redaction or encoding of any personal data, security measures, and a promise to destroy or return all personal data once they have served their purpose. *Id.* Compliance with the Data Protection Act is mandatory even if discovery is conducted through the Evidence Convention. *See* Commission Nationale de l'Informatique et des Libertés, Deliberation No. 2009–474 of 23 July 2009 concerning Recommendations for the Transfer of Personal Data in the Context of American Court Proceeding Known as "Discovery," *available at* Defs.' Opp'n Mot. Compel Ex. 2.

A first violation of the Data Protection Act is punishable by criminal sanctions of up to 150,000 and imprisonment of up to five years, with a subsequent violation punishable by sanctions of up to 300,000. Data Protection Act, art. 47. The Commission Nationale de l'Informatique et des Libertés is the French Data Protection Authority charged with enforcing the Data Protection Act. Since 2006, there have been at least a dozen decisions by the Commission imposing monetary sanctions, including a 150,000 sanction against Google on January 3, 2014. Chafiol–Chaumont Decl. ¶ 23. Notably, the sanction against Google was based on Google merging "into one single policy the different privacy policies applicable to about sixty of its services," thereby affecting "[n]early all Internet users in France," not the gathering of emails in response to a discovery request. Pl.'s Reply Mot. Compel Ex. C. The Vivendi Defendants are not aware of any decision imposing sanctions for a violation of the Data Protection Act in connec-

tion with a party's efforts to respond to discovery requests.

## D. The Motion To Compel

On January 21, 2014, the plaintiff filed the Motion to Compel. In their opposition, the Vivendi Defendants faulted the plaintiff for not meeting and conferring regarding a protocol for conducting discovery under the Evidence Convention and complying with the Data Protection Act before filing. By that point, it had become clear that the parties disagreed over a fundamental issue: whether the plaintiff had to comply with French law when conducting discovery in this court. The parties had conferred on that issue and exchanged authorities supporting their responsive positions. The plaintiff acted appropriately by filing the Motion to Compel.

On January 24, 2014, the Vivendi Defendants produced some 2,000 pages of documents found in custodian files located in the offices of Vivendi's U.S. subsidiary. The Vivendi Defendants claim that many responsive materials can be found in the United States, because employees of Vivendi's U.S. subsidiary were involved in the Restructuring and because Grainge lives in California.

## II. LEGAL ANALYSIS

The Motion to Compel turns on the legal implications of the Blocking Statute and the Data Protection Act. The Delaware Supreme Court has not had the opportunity to address how a Delaware court should proceed when confronted with a foreign statute that purports to block discovery or mandate compliance with certain procedures. Nor has the Court of Chancery. The Delaware Superior Court has reviewed a discovery master's recommendation regarding whether to require parties to use the Evidence Convention to obtain discovery from Finland and agreed that discovery could proceed under the Rules of Civil Procedure. *See In re Asbestos Litig.,* 623 A.2d 546, 550 (Del.Super.1992).

Outside of Delaware, courts have frequently addressed whether parties to litigation in American courts can obtain relief from customary discovery requests by invoking foreign laws. The United States Supreme Court has considered the issue twice. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa,* 482 U.S. 522, 524, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); *Société Nationale pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). On both occasions, the United States Supreme Court held that an American court has the power to require a party to respond to discovery conducted in accordance with the Rules of Civil Procedure, although the court must make a discretionary determination about whether to do so on the facts of the case. *See Aérospatiale,* 482 U.S. at 543–46, 107 S.Ct. 2542; *Rogers,* 357 U.S. at 204–06, 78 S.Ct. 1087.

The leading case is *Aérospatiale,* where the question presented was "the extent to which a federal district court must employ the procedures set forth in the [Evidence] Convention when litigants seek answers to interrogatories, the production of documents, and admissions from a French adversary over whom the court has personal jurisdiction." 482 U.S. at 524, 107 S.Ct. 2542. The defendants in the underlying action were French corporations sued in tort for manufacturing and selling a defective airplane. When the plaintiffs served requests for production of documents and for admissions, the French corporations moved for a protective order, contending that the Blocking Statute prevented them from complying and that discovery only could proceed under the Evi-

dence Convention. The district court, the court of appeals, and the United States Supreme Court each rejected the French corporations' position. After reviewing the language, history, and purpose of the Evidence Convention, the United States Supreme Court held that it "does not speak in mandatory terms which would purport to describe the procedures for all permissible transnational discovery and exclude all other existing practices." *Id.* at 534, 107 S.Ct. 2542. The United States Supreme Court further held that the Evidence Convention "does not modify the law of any contracting state, require any contracting state to use the Convention procedures, either in requesting evidence or in responding to such requests, or compel any contracting state to change its own evidence-gathering procedures." *Id.* The United States Supreme Court concluded that the Evidence Convention was "a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad." *Id.* at 536, 107 S.Ct. 2542.

The *Aérospatiale* decision also addressed whether litigants should use the Evidence Convention as a tool of first resort before conducting discovery under the Rules of Civil Procedure. The United States Supreme Court declined to require use of the Evidence Convention in the first instance, noting that "[i]n many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the [Civil] Rules." *Id.* at 542, 107 S.Ct. 2542. In reaching this holding, the United States Supreme Court considered arguments about the " 'judicial sovereignty' of the host nation" and the tradition in civil law countries of having evidence gathered by a judicial officer rather than by private attorneys. *Id.* at 543, 107 S.Ct. 2542. The United States

Supreme Court specifically held that "[t]he French 'blocking statute' ... does not alter our conclusion. It is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Id.* at 544 n. 29, 107 S.Ct. 2542 (citing *Rogers*, 357 U.S. at 204–06, 78 S.Ct. 1087).

Having concluded that an American court has the power to enforce discovery rulings under the Rules of Civil Procedure, the *Aérospatiale* court emphasized that a trial court nevertheless should exercise its discretion in light of principles of comity and should make a particularized determination based on the interests at stake in a given case. *Id.* at 543–44, 107 S.Ct. 2542.

American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses.... American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state.

*Id.* at 546, 107 S.Ct. 2542. As to the Blocking Statute, the United Stated Supreme Court stated that "[t]he lesson of comity is that neither [an American court's] discovery order nor the blocking statute can have the same omnipresent

effect that it would have in a world of only one sovereign." *Id.* at 544 n. 29, 107 S.Ct. 2542. The United Stated Supreme Court held that "[t]he blocking statute thus is relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material." *Id.*

In a footnote, the *Aérospatiale* court quoted from a draft of what would become the Restatement (Third) of Foreign Relations Law (1987) [hereinafter Restatement] to identify factors that a court should consider when exercising its discretion:

(1) the importance to the ... litigation of the documents or other information requested;

(2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Id.* at 544 n. 28, 107 S.Ct. 2542 (internal quotation marks omitted).

The principles announced in *Aérospatiale* and *Rogers* are now reflected in Sections 441 and 442 of the Restatement. Section 441 of the Restatement makes clear that the forum state has the power to enforce its laws. Section 441(1), emended for purposes of the current case, states: "In general, a state [France] may not require a person ... (b) to refrain from doing an act [complying with discovery] in another state [Delaware] that is required by the law of that state [Delaware]...."

Section 441(2), emended for purposes of the current case, states: "In general, a state [Delaware] may require a person of foreign nationality (a) to do an act in that state [complying with discovery requests in Delaware] even if it is prohibited by the law of the state of which he is a national [France]...." Comment g to Section 441 confirmed that "[t]he principles of this section apply to compulsion by a subdivision of a state having authority to compel or prohibit conduct." In other words, although the term "state" in the Restatement refers to sovereign international states like France and the United States, for purposes of Section 441, the reference includes subdivisions of the United States such as Delaware.

Section 442 of the Restatement applies the general principles set forth in Section 441 to the specific problem of discovery requests. Consistent with *Aérospatiale* and *Rogers,* Section 442(1)(a) recognizes the power of an American court to order a litigant to produce discovery located in a foreign state: "A court ... in the United States ... may order a person subject to its jurisdiction to produce documents, objects, or other information relevant to an action or investigation, even if the information or the person in possession of the information is outside the United States." Section 442(1)(b) recognizes the power of an American court to impose sanctions for the failure to comply with an order to provide discovery:

Failure to comply with an order to produce information may subject the person to whom the order is directed to sanctions, including finding of contempt, dismissal of a claim or defense, or default judgment, or may lead to a determination that the facts to which the order was addressed are as asserted by the opposing party.

Section 442(1)(c) contains the list of factors cited by the *Aérospatiale* court as considerations that American courts should weigh when deciding whether and how to exercise their authority.

Section 442(2) of the Restatement provides additional guidance regarding the actions an American court may take when a foreign statute, like the Blocking Statute or the Data Protection Act, purports to prohibit or limit a litigant's ability to comply with an American court's order. Under those circumstances, the Restatement states:

(a) a court or agency in the United States may require the person to whom the order is directed to make a good faith effort to secure permission from the foreign authorities to make the information available.

(b) a court or agency should not ordinarily impose sanctions of contempt, dismissal, or default on a party that has failed to comply with the order for production, except in cases of deliberate concealment or removal of information or of failure to make a good faith effort in accordance with paragraph (a);

(c) a court or agency may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

The Delaware Supreme Court regards federal decisions as persuasive authority on discovery matters. *See, e.g., Appriva S'holder Litig. Co. v. EV3, Inc.,* 937 A.2d 1275, 1286 (Del.2007) ("Where, as here, the Superior Court's Rules of Civil Procedure closely track the Federal Rules of Civil Procedure, cases interpreting the federal rules are persuasive authority for our construction purposes."); *Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1191 n. 11 (Del.1988) ("Decisions interpreting the Federal Rules of Civil Procedure are usually of great persuasive weight in the construction of parallel Delaware rules; however, such decisions are not actually binding upon Delaware courts." (citations omitted)). The Delaware Supreme Court also has followed principles of law set forth in the Restatement.[3] In the *Asbestos* decision, the Delaware Superior Court followed *Aérospatiale,* held that the Evidence Convention was not mandatory, and required a Finnish defendant to comply with discovery requests promulgated under the Delaware Rules of Civil Proce-

---

**3.** *See D'Angelo v. Petroleos Mexicanos,* 331 A.2d 388, 391–92 (Del.1974) (citing to an earlier version of the Restatement for the proposition that the act of state doctrine is similar to a conflict of laws principle: "It is 'similar to those conflict of laws principles that direct the choice of a foreign law, or apply the principles of res judicata to foreign judgments, or give faith and credit to foreign legislation or to foreign judgments, or dismiss the proceedings on the basis of *forum non conveniens.*'" (quoting Restatement (Second) of the Foreign Relations Law of the United States § 41, cmts. a and c)). The Delaware Supreme Court has adopted principles codified in other restatements of law. *See, e.g., In re Peierls Family Inter Vivos Trusts,* 77 A.3d 249, 255 (Del.2013) ("When confronted with a choice-of-law issue, Delaware courts adhere to the Restatement (Second) of Conflict of Laws."); *Riedel v. ICI Ams. Inc.,* 968 A.2d 17, 20 (Del.2009) ("Generally, to determine whether one party owed another a duty of care, we follow the guidance of the Restatement (Second) of Torts."); *Falconi v. Coombs & Coombs, Inc.,* 902 A.2d 1094, 1099 (Del. 2006) ("In the context of determining vicarious liability for a tort, this Court has recognized the value of the Restatement (Second) of Agency as an aid in deciding whether an individual is an employee or independent contractor.").

dure, notwithstanding the fact that "under Finnish law, it is the sole province of the judiciary to gather evidence in civil proceedings." 623 A.2d at 549–50.[4] This decision therefore follows *Aérospatiale* and the Restatement.

## A. This Court's Power To Compel The Vivendi Defendants To Respond To Discovery Conducted Under The Court of Chancery Rules

■ In the Vivendi Defendants' communications with plaintiff, in their General Objection No. 2, and at times in their opposition to the Motion to Compel, the Vivendi Defendants appear to take the position that because of the Blocking Statute, discovery only can proceed under the Evidence Convention and only in compliance with the Data Protection Act. Under *Aérospatiale*, *Rogers*, the *Asbestos* case, and the Restatement, that position is incorrect. This court has the power to require foreign litigants like the Vivendi Defendants to respond to discovery conducted under the Court of Chancery Rules. *See Aérospatiale*, 482 U.S. at 543–46, 107 S.Ct. 2542; *Rogers*, 357 U.S. at 204–06, 78 S.Ct. 1087; *Asbestos*, 623 A.2d at 549–50; Restatement §§ 441, 442(1)(a). To the extent the Vivendi Defendants contend otherwise, their objection to discovery is overruled.

## B. The Discretionary Exercise Of This Court's Power Over The Discovery Process

■ The more important question is the degree to which discovery should proceed under the Court of Chancery Rules in light of principles of comity. The Vivendi Defendants have not objected to specific categories of discovery. Instead, they request an order compelling the plaintiff to resort first to the Evidence Convention, that information only be produced in compliance with the Data Protection Act, and that discovery under the Court of Chancery Rules proceed only to the extent that the foregoing avenues and the materials obtained from other parties prove inadequate. As suggested by the *Aérospatiale* decision, this court will "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." 482 U.S. at 546, 107 S.Ct. 2542. In doing so, this court will use the factors cited in *Aérospatiale* and set forth in § 442(1)(c) of the Restatement.

### 1. The Importance Of The Documents Requested

■ The first Restatement factor directs the court to consider the importance to the litigation of the documents or other

4. The *Asbestos* decision reviewed and adopted a master's report that reached these conclusions. The *Asbestos* court applied a deferential standard of review to the master's report, holding that "[m]asters' decisions on pre-trial, non-dispositive issues should be reviewed under the clearly erroneous standard, while decisions which are case dispositive or which determine substantial issues and establish legal rights should be subject to de novo review." *Id.* at 548. In an appeal from a master's decision that had been adopted by the Court of Chancery using a similarly deferential standard, the Delaware Supreme Court held that "the standard of review for a mas-

ter's findings—both factual and legal—is *de novo.*" *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del.1999). Because the *Asbestos* decision reviewed the master's factual findings and discretionary rulings under a clearly erroneous standard, those aspects of the decision cannot be regarded as precedential in light of *DiGiacobbe*. In my view, the *Asbestos* decision remains persuasive authority as to the legal principles, because the Delaware Superior Court had to evaluate those principles independently to reach the determination that the master's decision was not "contrary to the law." 623 A.2d at 550.

information requested. This factor calls on the court to consider the degree to which the information sought is more than merely relevant under the broad test generally for evaluating discovery requests.[5] In this case, the discovery directed to the Vivendi Defendants meets the test.

The Vivendi Defendants are not third parties or secondary players. They are primary defendants whose actions, decisions, and related communications lie at the heart of this proceeding. Vivendi was the controlling stockholder of Activision. The Vivendi Directors were both directors of Activision and senior decision-makers for Vivendi. The Complaint alleges that the Vivendi Defendants initiated the process leading to the Restructuring and that Vivendi's need for liquidity drove the transaction. The Complaint alleges that the Vivendi Defendants made threats to force a liquidity event on Vivendi's timetable and caused the disbanding of a special committee formed to negotiate on behalf of Activision's minority stockholders. The Complaint alleges that the Vivendi Defendants then turned to Kotick and Kelly to orchestrate a liquidity-generating transaction by exploiting Kotick and Kelly's self-interest as conflicted fiduciaries.

The Vivendi Defendants and other Vivendi employees doubtless had extensive communications, conducted significant internal analyses, and deliberated before and during the course of conduct that led ultimately to the Restructuring. Documents and communications relating to these matters cannot be obtained from anyone else and are essential to understand what the Vivendi Defendants did and why they did it.

Not only can this information not be obtained except from the Vivendi Defendants, much of it cannot be obtained except from Vivendi's files and servers in France. Although the Vivendi Defendants have suggested that information could be available from Vivendi's U.S. subsidiary, so far the production has consisted of anodyne materials such as the closing binder for the transaction. Perhaps more importantly, Vivendi's counsel advised the court during the hearing on the Motion to Compel that all of Vivendi's electronic documents are housed on its servers in Paris. There are no backups in the United States, and none of the computers in the United States are believed to have responsive documents.

In an era when the vast majority of information is created electronically, the process of conducting discovery largely means the process of conducting electronic discovery. All of the Vivendi Defendants' electronic discovery is located in France. These documents and communications are not just important, they are essential to any effort to fully and fairly litigate and try the case.

Given the plaintiff's allegations regarding the Vivendi Defendants' actions, the court finds that the discovery sought from

---

5. *See Strauss v. Credit Lyonnais, S.A.,* 249 F.R.D. 429, 440 (E.D.N.Y.2008) ("Because the scope of civil discovery in the United States is broader than that of many foreign jurisdictions, some courts have applied a more stringent test of relevancy when applying the Federal Rules to foreign discovery."); *cf. Trade Dev. Bank v. Cont'l Ins. Co.,* 469 F.2d 35, 40–41 (2d Cir.1972) (denying defendant's discovery requests for the identities of Swiss bank account customers because such identities were irrelevant to whether a bank employee had used customer accounts "in furtherance of his fraudulent scheme"); *In re Two Grand Jury Subpoenas Duces Tecum (Union Bank of Switz.),* 158 Misc.2d 222, 601 N.Y.S.2d 253, 256 (N.Y.Sup.Ct.1993) (denying the government's discovery requests, in part, because the District Attorney "conceded that the subpoenaed material is not crucial to his Grand Jury presentation").

the Vivendi Defendants is both relevant and vital to the litigation of the plaintiff's claims. The Vivendi Defendants' actions, decisions, and related communications are at the heart of this case and are not available from other sources. Because these documents and information are highly relevant and important to the claims in this litigation, this factor counsels in favor of conducting discovery under this court's rules.

## 2. The Degree Of Specificity Of The Request

The second Restatement factor directs the court to consider the degree of specificity of the request. The court has reviewed the plaintiff's document requests and finds them to be appropriately focused and narrowly tailored for the needs of the case. The Vivendi Defendants have agreed that the plaintiff's requests are "enumeratively limited" to a sufficient degree to comply with the requirements of the Evidence Convention. The exceptions are requests 14 and 15 of the plaintiff's second request for production, which are designed to prevent surprise documents from popping up at trial. Request 14 seeks "[a]ll documents on which you intend to rely in support of any claim or defense in this action." Request 15 seeks "[a]ll documents you intend to introduce or otherwise use at any hearing or trial in this action." During the hearing on the Motion to Compel, the Vivendi Defendants agreed that they would not be able to rely at trial on any documents not previously produced in discovery, which moots the need for requests 14 and 15.

The plaintiff's discovery requests are therefore sufficiently specific so as not to confront the Vivendi Defendants with "unnecessary, or unduly burdensome, discovery" that could place the Vivendi Defendants "in a disadvantageous position." *Aérospatiale*, 482 U.S. at 546, 107 S.Ct.

2542. The requests do not create any concern about discovery abuse or the improper use of discovery requests. *See id.* This factor counsels in favor of conducting discovery under this court's rules.

## 3. Whether The Information Originated In The United States

The third Restatement factor directs the court to consider whether the information originated in the United States. If the information originated in the United States and is simply being stored abroad or was taken there, then the American origins of the information and its prior presence in the United States counsel in favor of production. A company or individual should not be able to evade discovery in American courts by secreting information offshore.

It is not clear at this stage of the case what discoverable materials originated where. The Vivendi Defendants have asserted that much of the work on the transaction was conducted through its United States subsidiary, suggesting that a significant portion of the documents and communications currently housed in France originated in the United States. In addition, the plaintiff points out that Activision is located in California, that Vivendi has an office in New York, that key meetings took place in New York on January 16 and May 30, 2013, and that the special committee was disbanded at a Board meeting held in California on June 6. Doubtless there are many other communications exchanged among the Vivendi Directors and their colleagues who principally live and work in France.

This factor is currently in equipoise. For documents and communications that originated in the United States from individuals who live and work in the United States or in connection with key meetings

that occurred in the United States, this factor counsels in favor conducting discovery under this court's rules. For documents and communications that originated and remained in France, this factor counsels against conducting discovery under this court's rules. It is not possible at this point to make a finer determination.

### 4. The Availability Of Alternative Means Of Securing The Information

The fourth Restatement factor is the availability of alternative means of securing the information. As discussed in connection with the first factor, much of the information that the plaintiff seeks, including all of the Vivendi Defendants' internal information, only can be obtained from the Vivendi Defendants. There is no alternative source. The Vivendi Defendants contend that the Evidence Convention provides an alternative means of securing the information.

Whether the Evidence Convention can be used to obtain the discovery the plaintiff seeks in timely fashion is a known unknown. The scheduling order in this matter calls for trial to take place on December 8–12, 2014. To that end, the order called for a rolling production of documents to begin on January 24, for substantial completion of document production by

March 31, for privilege logs and completion of remaining document production by April 16, and for completion of non-expert fact discovery, including depositions, by July 31. That is a brisk schedule, but one that the experienced practitioners who represent the parties in this case can readily meet—at least using the discovery methods contemplated by the Court of Chancery Rules. If those methods are employed, then there is every reason to expect that "the most important aspect of the scheduling order—the trial date—will be preserved." *Christian v. Counseling Res. Assocs., Inc.*, 60 A.3d 1083, 1085 (Del. 2013).

The Vivendi Defendants posit optimistically that the parties can proceed under the Evidence Convention and meet the deadlines in the scheduling order. The Vivendi Defendants suggest that "[i]n all likelihood, it would take merely a few weeks to secure disclosure of covered documents under the letter of request procedure, and perhaps a few months to request and complete depositions of French witnesses in France, using the less formal commissioner process." Defs.' Opp'n Mot. Compel at 27.

The plaintiff is skeptical. Numerous decisions evince similar skepticism about the efficiency, timeliness, and effectiveness of the Evidence Convention.[6] Delaware

---

**6.** *See, e.g., Aérospatiale*, 482 U.S. at 542, 107 S.Ct. 2542 ("In many situations the Letter of Request procedure authorized by the [Evidence] Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules."); *Trueposition, Inc. v. LM Ericsson Tel. Co.*, 2012 WL 707012, at *5 (E.D.Pa. Mar. 6, 2012) ("[I]t must be noted that the procedures required pursuant to the . . . Evidence Convention are much more likely to be time-consuming than the procedures under the Federal Rules."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 53 (E.D.N.Y.2010) ("Although there is no dispute that the [Evidence] Convention affords

an alternative means for securing the information, the outcome of a request pursuant to the [Evidence] Convention is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration. Thus, the mere fact that the [Evidence] Convention provides an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case."); *Benton Graphics v. Uddeholm Corp.*, 118 F.R.D. 386, 391 (D.N.J.1987) (concluding that "in light of the lengthy history of discovery in this case and the potential for additional delays" the Evidence Convention

decisions are hardly sanguine. When considering a motion to dismiss under the doctrine of *forum non conveniens*, which requires evaluating the relative ease of access to proof in Delaware versus a competing jurisdiction, the Delaware Supreme Court has described the Evidence Convention procedures as "circuitous" and "somewhat cumbersome." *Ison v. E.I. DuPont de Nemours & Co., Inc.*, 729 A.2d 832, 843 (Del.1999). The Delaware Superior Court has offered faint praise, suggesting that the Evidence Convention poses difficulties that are "not insurmountable." *Wright v. Am. Home Prods. Corp.*, 768 A.2d 518, 538 (Del.Super.2000).

At present, the court cannot predict whether or not the Evidence Convention procedures will provide an adequate alternative means of securing discovery. This factor currently does not point either in favor of or against use of the Evidence Convention.

### 5. The Competing Interests

The final factor is a balancing of competing interests, taking into account the extent to which the discovery sought serves important interests of the forum state versus the degree to which providing the discovery would undermine important interests of the foreign state. For this factor, the Blocking Statute and the Data Protection Act warrant separate consideration.

#### a. Delaware's Interest

Delaware has a substantial interest in providing an effective forum for litigating disputes involving the internal affairs of Delaware corporations. "Delaware [also] [has] a significant and substantial interest in actively overseeing the conduct of those owing fiduciary duties to shareholders of Delaware." [7] When individuals choose to serve as directors of a Delaware corporation, their "status as directors and their power to act in that capacity arise exclusively under the Delaware corporation statutes," and they accept their directorships on notice "that they [can] be [hauled] into the Delaware Courts to answer for alleged breaches of the duties imposed on them by the very laws which empowered them to act in their corporate capacities." *Armstrong*, 423 A.2d at 176. "Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of its domestic corporations. Delaware has an obligation to provide such a forum."

procedures were unlikely to "prove effective").

**7.** *Armstrong v. Pomerance*, 423 A.2d 174, 177 (Del.1980); *accord Ryan v. Gifford*, 918 A.2d 341, 349 (Del.Ch.2007) ("Delaware courts have a significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations." (internal quotation marks omitted)); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 608492, at *5 (Del.Ch. Oct. 16, 1996) (Allen, C.) ("[C]laims that a director has breached his fiduciary duties to a Delaware corporation are of special concern to this court."); *In re Chambers Dev. Co., Inc. S'holders Litig.*, 1993 WL 179335, at *3 (Del.Ch. May 20, 1993) ("I acknowledge that Delaware courts do have a significant and substantial interest in overseeing the conduct of those owing fiduciary duties to shareholders of Delaware corporations." (internal quotation marks omitted)); *cf. CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 93, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (recognizing that a chartering state has "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing"); Roberta Romano, *The Genius of American Corporate Law* 38–39 (1993) ("The most important transaction-specific asset in the chartering relation is an intangible asset, Delaware's reputation for responsiveness to corporate concerns," which stems from "a comprehensive body of case law, judicial expertise in corporation law, and administrative expertise in the rapid processing of corporate filings.").

*Sternberg v. O'Neil,* 550 A.2d 1105, 1125 (Del.1988) (citation and footnote omitted). "Delaware's legitimacy as a chartering jurisdiction depends on it." *NACCO Indus., Inc. v. Applica, Inc.,* 997 A.2d 1, 26 (Del. Ch.2009).

The fact that this action is being pursued by a stockholder plaintiff rather than by a government agency does not diminish Delaware's interest. "Our legal system has privatized in part the enforcement mechanism for policing fiduciaries by allowing private attorneys to bring suits on behalf of nominal shareholder plaintiffs." *In re Fuqua Indus., Inc. S'holder Litig.,* 752 A.2d 126, 133 (Del.Ch.1999).

A fundamental condition of the corporate form when stockholders are widely dispersed, as typically occurs in public corporations, is that individual shareholders have little incentive to bear the costs associated with activities that monitor board of director (or management) performance. Of course, a fundamental advantage that the corporate form offers to owners of capital is the utility that an investor gains through centralized management. Centralized management allows passive (low cost) ownership and promotes investor diversification. Limited liability and the entity status of a corporation similarly allow investors to be relatively passive. While the conditions that allow investors to be rationally passive are a primary source of utility, they can also lead to inefficiency to the extent centralized management may have incentives that are not perfectly aligned with those of the residual owners of the firm, which is inevitably the case. This imperfect alignment of incentives will inevitably lead to excess costs associated with centralized management. For that reason some expenditures for shareholder monitoring would be efficient. Such monitoring is, of course, more or less costly to the shareholder who engages in it. In a public company with widely distributed shares any particular shareholder has very little incentive to incur those costs himself in pursuit of a collective good, since unless there is some method to force a sharing of costs, he will bear all of the costs and only a (small) pro rata share of any gains that the monitoring yields.

*Bird v. Lida, Inc.,* 681 A.2d 399, 402–03 (Del.Ch.1996) (Allen, C.) (footnote omitted). Due to rational passivity, "it is likely that in a public corporation there will be less shareholder monitoring expenditures than would be optimum from the point of the shareholders as a collectivity." *Id.* at 403. Incentivized by contingent fees, specialized law firms representing stockholder plaintiffs can "pursue monitoring activities that are wealth increasing for the collectivity (the corporation or the body of its shareholders)." *Id.* "In so doing, corporations are safeguarded from fiduciary breaches and shareholders thereby benefit." *Fuqua,* 752 A.2d at 133. Understood from this perspective, well-founded stockholder litigation becomes "a cornerstone of sound corporate governance." *Id.; accord King v. VeriFone Hldgs., Inc.,* 994 A.2d 354, 356 (Del.Ch.2010) (noting that "[r]epresentative litigation plays an important role in protecting the interests of stockholders," but only so long as "suits are actually filed on the basis of a real concern that wrongdoing has occurred and after a proper investigation"), *rev'd on other grounds,* 12 A.3d 1140 (Del.2011).

In this case, each of the Vivendi Directors submitted to the jurisdiction of the Delaware courts when they agreed to be an Activision director. 10 *Del. C.* § 3114. By submitting to the jurisdiction of the Delaware courts, those individuals consented to the methods used by the Delaware courts for conducting and deciding litiga-

tion, including the processes for discovery under the Delaware rules.

Vivendi likewise submitted to the jurisdiction of the Delaware courts in connection with the Restructuring. In its Stock Purchase Agreement with Activision and ASAC, Vivendi submitted to the exclusive jurisdiction of the Delaware courts and agreed that Delaware law would govern any disputes. Pl.'s Reply Mot. Compel Ex. F §§ 11.8, 11.9. When agreeing to a Delaware forum and the application of Delaware law, Vivendi did not place any limitations on the available means of discovery. Vivendi took the same approach in the Business Combination Agreement, where it agreed to a Delaware forum without any limitations on the available means of discovery. BCA § 9.6.

This case is precisely the type of litigation in which Delaware has a paramount interest. According to the Complaint, Vivendi used its influence as a controlling stockholder with an affiliated majority on the Activision board to structure a transaction in which Vivendi obtained over $8 billion in desperately needed liquidity, allegedly by exploiting the conflicting self-interest of Activision's two senior officers, at the expense of the interests of Activision and its minority stockholders who otherwise could have obtained greater value.

### b. The Blocking Statute

Against Delaware's powerful interest in the efficient and effective handling of disputes involving the internal affairs of a Delaware corporation and allegations of fiduciary misconduct, the Vivendi Defendants cite the Blocking Statute. In *Aérospatiale*, the United States Supreme Court held that a blocking statute "is relevant to the court's particularized comity analysis only to the extent that its terms and its enforcement identify the nature of the sovereign interests in nondisclosure of specific kinds of material." 482 U.S. at 544 n. 29, 107 S.Ct. 2542. The current Blocking Statute does not meet this test.

As originally adopted, the Blocking Statute addressed only foreign government investigations into French maritime interests and thus could be understood to address a specific French sovereign interest in the nondisclosure of that type of information. Since its revision in 1980, the Blocking Statute has applied generally to all foreign litigation and purports to make it illegal for "any person to request, search for or communicate, in writing, orally or in any other form, documents or information of an economic, commercial, industrial, financial or technical nature for the purposes of establishing evidence in view of foreign judicial or administrative proceedings." Blocking Statute, art. 1 *bis*. As framed, the Blocking Statute is expansively broad. It purports to encompass any documents or information "relating to economic, commercial, industrial, financial or technical" matters. *Id*. It does not focus on a specific kind of material, nor does it identify a specific French sovereign interest.

As currently drafted, the Blocking Statute reflects France's preference for its own methods of litigation. Every country naturally prefers its own methods of litigation; otherwise it would change them. The United States and Delaware prefer their own methods of litigation and have an interest in using them. The competing interests offset, which prevents an interest in one's own system of litigation from being used effectively in a balancing test. Under Sections 441 and 442 of the Restatement, a tie goes to the forum.

Notably, Vivendi has chosen previously to sue in the United States to take advantage of the greater access to evidence provided by American-style discovery. In a filing in *Vivendi S.A. v. T–Mobile USA*

*Inc.*, 586 F.3d 689 (9th Cir.2009), Vivendi stated that it sued in the United States for "reasons of convenience," including "Vivendi's substantial U.S. presence" and "desire to litigate in a forum that would maximize its access to evidence." Transmittal Affidavit of Jeffrey M. Gorris (the "Gorris Aff.") Ex. 2 at 14. In that same filing, Vivendi complimented the benefits of discovery under the Federal Rules of Civil Procedure, asserting that "a 'bite at the apple' of meaningful discovery" was a "valid convenience reason" for choosing to litigate in the United States. *Id.* at 19. In a later filing, Vivendi elaborated: "Defendants do not dispute that the United States offers *greater* access to evidence at trial than any alternative forum because the parties have the vast majority of documents, and the parties will have to produce that evidence pursuant to the Federal Rules of Civil Procedure." Gorris Aff. Ex. 4 at 24. Vivendi also took the position that the former executives of the German defendants were subject to the court's powers of compulsory process. Gorris Aff. Ex. 5 at 14 ("Despite Defendants' assertion that Messrs. Winkler, Golob, and Ricke are 'outside this Court's powers of compulsory process,' under Fed.R.Civ.P. 30(b)(1) a former officer, director, or managing agent of a corporate party may be noticed for deposition, even if they are not otherwise subject to the court's personal jurisdiction." (citation omitted)).

As noted, studious compliance with the Blocking Statute as written would prevent Vivendi from participating in the American discovery process as a plaintiff. Vivendi's prior decisions to disregard the Blocking Statute when advantageous undercut its ability to invoke the Blocking Statute now, when the shoe is on the other foot. Rather than taking a consistent and principled stance, Vivendi appears to be adopting positions of convenience. Vivendi's own actions undermine its current assertions about the significance of the Blocking Statute and the need to resort to the Evidence Convention.

### c. The Data Protection Act

The Vivendi Defendants also cite France's interest in the Data Protection Act. Unlike the Blocking Statute, the Data Protection Act does represent a "sovereign interest[ ] in nondisclosure of specific kinds of material." *Aérospatiale*, 482 U.S. at 544 n. 29, 107 S.Ct. 2542. The Data Protection Act codifies the European Union's privacy regime. European Union members are required to afford "privacy with respect to the processing of personal data." European Directive, art. 1. The Data Protection Act therefore reflects both France's interest in protecting the privacy rights of its citizens and its interest in complying with the directives of the European Union.

Steps can readily be taken to accommodate the French interests reflected in the Data Protection Act. Compliance with the Data Protection Act appears to require only minor modifications to the discovery process as normally conducted in this court.

### C. The Discovery Framework

Having considered the factors set forth above, the court is not prepared to require discovery from the Vivendi Defendants to proceed solely by way of the Evidence Convention. Nor is the court prepared to risk jeopardizing the trial schedule by requiring the parties to use the Evidence Convention as a means of first resort. Rather, as to document discovery, the parties will proceed under both the rules of this court and the Evidence Convention.

█ As contemplated by Section 442(2)(a) of the Restatement, the Vivendi Defendants shall make a good faith effort

to secure permission from French authorities to make available the information sought by the plaintiff. The Vivendi Defendants shall prepare and confer with plaintiff's counsel regarding a letter of request designed to obtain the information sought by the plaintiff in his document requests, other than items 14 and 15 of the second request for production. Within five days of the date of this decision, the Vivendi Defendants shall submit a form of the letter of request to the court along with information sufficient for the court to send the request to the appropriate French authority. The Vivendi Defendants shall make a good faith effort to obtain promptly the assistance of the appropriate French authority. If the appropriate French authority authorizes compliance with the letter of request, then the Vivendi Defendants' concern about the Blocking Statute will be moot.

If production has not been authorized by March 31, 2014, when substantial completion of document production is due, then the Vivendi Defendants shall produce on that date the documents called for by the plaintiff's discovery requests or face the prospect of sanctions in this court. In considering sanctions, the court will be guided by the factors cited in Section 442 of the Restatement and will take into account the recommendation in Section 442(2)(c) of the Restatement that the appropriate sanctions involve making "findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful." Restatement § 442(2)(c).

To comply with the Data Protection Act, the parties shall enter into a two-tier confidentiality stipulation and order of the type customarily used in this court and containing a use restriction providing that the discovery material shall be used only for purposes of this litigation. The confidentiality order shall provide for designating as "Confidential" documents containing the types of information protected by the Data Protection Act, such as the identities of minor children and other family members, the address of a personal residence, and personal data revealing racial or ethnic origin, religious beliefs, a trade union membership, or concerning health or sex life. The parties shall confer regarding, and the confidentiality order shall specify, the categories of information covered by the Data Protection Act that the Vivendi Defendants may redact. The parties shall confer regarding and seek court approval for any proposal to use pseudonyms. Setting aside the named defendants and the core individuals who worked on the Restructuring, for whom the Vivendi Defendants agree that using pseudonyms is not necessary, the court is not convinced at present that the Vivendi Defendants need to use pseudonyms for all other names in the production. If Vivendi first provides the plaintiff with a confidential list of individuals, their titles, and roles in the Restructuring, the plaintiff may be in a position to agree on using pseudonyms for some or all of them. This suggestion is not intended to restrict the parties' flexibility or creativity in crafting alternative solutions.

 As to depositions, the Vivendi Directors who are residents of France shall make themselves available for deposition in the United States. By accepting a directorship in a Delaware corporation, the Vivendi Directors agreed to the jurisdiction of the State of Delaware, including for purposes of discovery. This court has undisputed authority to compel a named defendant, over whom the court has personal jurisdiction, to appear at trial. *See* 10 *Del.*

C. § 362; *Kingsbridge Capital Gp. v. Dunkin' Donuts Inc.*, 1989 WL 997175, at *1 (Del.Ch. Sept. 6, 1989). The same authority extends to compelling an appearance for purposes of a pre-trial deposition.

■ For other Vivendi witnesses who are located in France, the Vivendi Defendants shall make a good faith effort to secure permission from French authorities for a commissioner to oversee the taking of a deposition in France by plaintiff's counsel. If the Vivendi Defendants are unable to secure permission, then the court will consider on a case-by-case basis whether the court can and will require the witness to sit for deposition in the United States. Through its jurisdiction over Vivendi, this court can compel Vivendi's directors, officers, and managing agents to appear at trial or for a deposition in a particular location.[8] If the director, officer, or managing agent fails to attend, the court can impose sanctions on Vivendi as the party-

corporation. *See* Ct. Ch. R. 37(b)(2); *accord* Fed.R.Civ.P. 37(d) advisory committee's note ("The failure of an officer or managing agent of a party to make discovery as required by present Rule 37(d) is treated as the failure of the party."). If a witness is not a director, officer, or managing agent of Vivendi or otherwise subject to this court's jurisdiction, then the plaintiff must proceed under the Evidence Convention.

## III. CONCLUSION

The motion to compel is granted to the extent set forth in this decision.

8. *See Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1997 WL 716898, at *1 (Del.Super. Aug. 18, 1997) ("It is within the power of this Court to compel the live testimony of a non-resident officer, director or managing agent of a Delaware corporate [party] which has availed itself to the jurisdiction of this Court."); *Dalton v. Am. Inv. Co.*, 1981 WL 7619, at *1 (Del.Ch. June 9, 1981) (noting court's discretionary authority to order deposition at a particular location); *Lasher v. Sterwin Labs.*, 1980 WL 10017, at *1–2 (Del.Ch. Jan. 28, 1980) (ordering defendant corporation to produce witnesses for deposition in Delaware); 7 Daniel R. Coquillette et. al, *Moore's Federal Practice—Civil* § 30.03 (3d ed. 2013); 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2107 (3d ed. 2010) ("A [third party] subpoena is not necessary if the person to be examined [by deposition] is a party or an officer, director, or managing agent of a party." (footnotes omitted)); *see also* Ct. Ch. R. 43(b) (noting that a party at trial may call "an officer, director or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate the witness thus called by leading questions and contradict and impeach the witness in all respects as if the witness had been called by the adverse party").