**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| PVH POLYMATH VENTURE HOLDINGS LTD, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0502-BWD |
| TAG FINTECH, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

## FINAL REPORT

Final Report: January 31, 2024
Date Submitted: January 26, 2024

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; OF COUNSEL: Jason R. Scherr, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C.; *Attorneys for Plaintiff PVH Polymath Venture Holdings Ltd*.

David L. Finger, FINGER & SLANINA, LLC, Wilmington, Delaware; *Attorneys for Defendant TAG Fintech, Inc*.

**DAVID, M.**

On October 9, 2023, I issued an oral post-trial report[1] in this Section 220 proceeding, ordering defendant TAG Fintech, Inc. ("TAG" or the "Company") to produce certain books and records to plaintiff PVH Polymath Venture Holdings Ltd. ("Plaintiff" or "Polymath"). The October 9 report permitted Plaintiff to move for an award of attorneys' fees within thirty days.

This report grants Plaintiff's Motion for an Award of Attorneys' Fees and Expenses. Throughout this action, TAG sought to evade its statutory obligations to produce books and records, including by needlessly complicating and delaying the proceedings. TAG's glaringly egregious litigation conduct, detailed herein, warrants fee-shifting.

I. BACKGROUND

A. Polymath Serves A Demand To Inspect TAG's Books And Records.

TAG is a privately held Delaware corporation that serves as a holding company for TAG Innovation (Private) Limited ("TAG-Pakistan"), a Pakistani entity.[2] TAG's business, operated through TAG-Pakistan, uses e-commerce technology to deliver banking services like employee salary processing, Visa-

---

[1] The parties stipulated to submit this action to me for a final decision pursuant to Court of Chancery Rule 144(h). *See* Stipulation and Order for Final Resolution by the [Magistrate] in Chancery, Dkt. 12.

[2] *PVH Polymath Venture Hldgs. Ltd. v. TAG Fintech, Inc.*, C.A. No. 2023-0502-BWD, at 56:22-57:3 (Oct. 9, 2023) (TRANSCRIPT) [hereinafter, "Post-Trial Report Tr."], Dkt. 70.

network virtual and physical cards, bill payment, and person-to-person payments.[3] From TAG's inception through May 2022, non-party Talal Ahmad Gondal served as TAG's sole director and CEO.[4]

In April 2021, Polymath, an entity incorporated under the laws of the Republic of Cyprus, became TAG's first non-founder stockholder when it acquired TAG Class A and Class B common stock pursuant to two Stock Purchase Agreements.[5] Hamervate Limited, another Cyprus entity, is Polymath's sole director and owns all of Polymath's shares in trust for non-party Abhishek Gupta.[6] Gupta is the sole beneficial owner of Polymath shares, makes all decisions for Polymath, and signed the Stock Purchase Agreements on Polymath's behalf.[7]

On December 19, 2022, Polymath sent TAG a letter demanding to inspect the Company's books and records pursuant to 8 *Del. C.* § 220 (the "Initial Demand").[8] The Initial Demand recounts that on October 28, 2020, the State Bank of Pakistan ("SBP") issued a license for TAG-Pakistan to operate as an electronic money

---

[3] *Id*. at 59:5-10; Verified Compl. for Inspection of Books and Records [hereinafter, "Compl."] ¶ 14, Dkt.1.

[4] Post-Trial Report Tr. at 57:6-7.

[5] *Id*. at 57:11-14, 58:14-15.

[6] *Id*. at 57:15-21.

[7] *Id*. at 57:22-58:13.

[8] *Id*. at 58:24-59:3; Compl., Ex. E [hereinafter, "Initial Demand"].

institution in Pakistan.[9]  In February 2022, however, TAG submitted a forged letter to the SBP, which appeared to come from a Hong Kong investment advisory firm promising to commit additional funding to TAG-Pakistan.[10]  After the forgery was discovered, the SBP revoked TAG-Pakistan's business license.[11]  Premised on those allegations, the Initial Demand sought books and records to investigate (1) whether TAG's board of directors (the "Board") and senior management had engaged in misconduct, (2) the independence and disinterestedness of the Board, (3) the count and valuation of Polymath's shares of TAG common stock, and (4) whether pre-suit demand would be excused prior to commencing a derivative action.[12]

The Initial Demand stated that it was from "Polymath Venture Holdings Ltd."—in other words, it omitted the "PVH" in Polymath's full legal name.[13]  On December 27, 2022, TAG rejected the Initial Demand because "Polymath Venture Holdings Ltd." was not a record stockholder.[14]

On January 12, 2023, Polymath sent TAG a revised books and records demand that included Polymath's correct legal name (the "Demand").[15]  The Demand

---

[9] Post-Trial Report Tr. at 59:13-24; Initial Demand at 3.

[10] Post-Trial Report Tr. at 60:1-5; Initial Demand at 3.

[11] Post-Trial Report Tr. at 60:24-61:3; Initial Demand at 3.

[12] Post-Trial Report Tr. at 62:13-63:12; Initial Demand at 2.

[13] Post-Trial Report Tr. at 63:13-16; Initial Demand at 1.

[14] Post-Trial Report Tr. at 63:17-23; Compl., Ex. F.

[15] Post-Trial Report Tr. at 63:23-64:2; Compl., Ex. G [hereinafter, "Demand"], Dkt. 1.

attached a declaration stating that Gupta was authorized "to speak and represent on [Polymath's] behalf for purposes of claims of stock ownership."[16]

On January 20, 2023, TAG rejected the Demand, citing "serious concerns" that Gupta lacked authority to make the Demand on behalf of Polymath based on "public information from the registration system of Cyprus . . . indicat[ing] that there is only one director of Polymath, an entity named Hamervate Limited."[17] In response, Plaintiff explained that Hamervate Limited acts at Gupta's direction and also reminded TAG's principals that they knew him personally and had dealt with him directly on numerous occasions, including when Polymath signed the Stock Purchase Agreements.[18]

### B.    Polymath Sues To Compel Inspection And TAG Raises Defenses.

On May 8, 2023, Polymath initiated this action through the filing of a Verified Complaint for Inspection of Books and Records (the "Complaint").[19] On June 5, 2023, TAG filed an answer to the Complaint (the "Answer").[20] As previewed in the parties' correspondence, the Answer asserted that the Demand was "invalid because

---

[16] Post-Trial Report Tr. at 64:6-12; Demand at Ex. 1.

[17] Post-Trial Report Tr. at 64:24-65:4; Compl., Ex. H at 1-2.

[18] Compl., Ex. I.

[19] Post-Trial Report Tr. at 65:6-7; Compl. at 1.

[20] Post-Trial Report Tr. at 65:8-9; Def's. Ans. to Verified Compl. for Inspection of Books and Records [hereinafter, "Ans."], Dkt. 14.

Abhishek Gupta is neither a director nor an officer of Plaintiff and was not authorized by Plaintiff to make such demand on its behalf."[21]

The Answer also raised another, more surprising, defense—that TAG-Pakistan was "subject to an injunction from a Pakistani court which prohibits disclosure of its documents to third parties."[22]

According to TAG, when the Company received the Initial Demand in December 2022, it sent TAG-Pakistan a document preservation notice.[23] Purportedly in response to that notice, on January 7, 2023, Gondal's brother, Ijlal Gondal, filed a civil suit in Lahore, Pakistan District Court, seeking to enjoin the production of TAG-Pakistan's confidential information to third parties, including Plaintiff.[24] The same day, the Pakistan District Court issued an *ex parte* injunction restraining TAG-Pakistan and Gondal "from any illegal activity regarding the subject matter of the suit, till next date of hearing" (the "First Injunction").[25] The First Injunction included the caveat that "this order shall not effect [sic] the legal/judicial proceedings of any other department or Court."[26] Neither TAG nor

---

[21] Ans. at 17.

[22] *Id*. at 18.

[23] Post-Trial Report Tr. at 65:14-16.

[24] *Id*. at 65:22-66:3; *see also* Pl.'s Mot. to Compel, Ex. G, Dkt. 22.

[25] Post-Trial Report Tr. at 66:4-10; *see also* Pl.'s Mot. to Compel, Ex H [hereinafter, "First Injunction"] ¶ 3.

[26] Post-Trial Report Tr. at 66:10-12; *see also* First Injunction ¶ 3.

TAG-Pakistan appeared before the Pakistan District Court to oppose the First Injunction.[27]

## C. The Motion to Compel

In discovery, Plaintiff served TAG with document requests and interrogatories to discover the degree to which TAG exercises control over TAG-Pakistan and to identify the location of documents in TAG-Pakistan's possession responsive to the Demand. TAG objected to those requests on the grounds that the Company was "prevented from disclosing [such] information pursuant to the [First] Injunction."[28]

On June 29, 2023, Plaintiff filed a motion to compel (the "Motion to Compel").[29] At a July 7, 2023 hearing on the Motion to Compel, I explained that "[t]he language of the [First Injunction] [wa]s not entirely clear,"[30] and that, "[i]n

---

[27] Post-Trial Report Tr. at 66:13-15; *see also* First Injunction ¶ 4.

[28] Post-Trial Report Tr. at 67:6-9; *see also* Pl.'s Mot. to Compel, Ex. C ¶¶ 3, 9, 11, 13, 18, Dkt. 22.

[29] Post-Trial Report Tr. at 66:24-67:1; *see also* Pl.'s Mot. to Compel at 1.

[30] *PVH Polymath Venture Hldgs. Ltd. v. TAG Fintech, Inc.*, C.A. No. 2023-0502-BWD, at 35:20-21 (July 7, 2023) (TRANSCRIPT) [hereinafter, "July 7, 2023 Tr."], Dkt. 28; *see also id.* at 35:1-19

> The plaintiff[] argue[s] that the injunction does not apply to plaintiff's discovery requests because producing discovery to a stockholder plaintiff in a books and records action brought against a Delaware corporation isn't illegal activity, and the order specifically states that the order shall not affect judicial proceedings in any other court. But the company argues that the Pakistani injunction does apply and that, although 'Orders passed at the civil court level are not always well drafted, . . . the practice is that if an application

assessing the company's defenses in this action, I [would] have to decide the impact of the injunction on the parent company's ability to produce books and records from its Pakistani subsidiary[,]"[31] which I preferred to do on a full record. I therefore declined to compel production at that time, noting that TAG would be precluded from asserting it does not control TAG-Pakistan[32] and that "targeted discovery into the location of potentially responsive documents after trial could be needed."[33]

After that, TAG and TAG-Pakistan entered their appearances before the Pakistan District Court, and Ijlal Gondal sought permission to withdraw and refile

---

has been allowed, the order is read with the contents of the injunction application when construing the injunction order of a court.' The company also argues that the language stating that the order shall not affect judicial proceedings of any other court appears in every injunction and isn't intended to limit the effect of the injunction as it applies to sharing information in this proceeding.

(omission in original).

[31] *Id*. at 35:23-36:5.

[32] *See id*. at 36:8-22

As to the requests that seek information intended to demonstrate the degree of control that TAG Fintech, the Delaware parent company, exercises over the Pakistani subsidiary, those requests are denied because the company has agreed that it doesn't intend to argue, separate from its argument about the Pakistani injunction, that the parent company lacks access to the subsidiary's books and records. Since those are not live issues, these requests are not relevant to the parties' claims and defenses, and they're denied on that basis. But of course, the parent company will be estopped from arguing at trial that it doesn't possess or control TAG-Pakistan's documents, subject to its arguments about the Pakistani injunction.

[33] *Id*. at 37:11-13.

his action.[34]  On July 24, 2023, Ijlal Gondal refiled his action to obtain a new injunction more clearly prohibiting the defendants in that action "from sharing information and documents of [TAG-Pakistan] to anyone else/*in any proceedings*; till further orders" (the "Second Injunction").[35]

### D. TAG Levels Ups Its Aggressive Tactics.

On June 28, 2023, the Court entered a Stipulation and Scheduling Order (the "Scheduling Order") setting a pre-trial conference for August 17, 2023 and a one-day trial for August 24, 2023.[36]  The Scheduling Order required the parties to exchange witness lists by June 19, 2023 and to complete discovery by June 29, 2023.[37]

On July 24, 2023—almost a month after the discovery deadline—TAG produced an expert opinion to show that under the law of the Republic of Cypress, Gupta lacked authority to make the Demand or to initiate litigation on behalf of Polymath.[38]  The next day, TAG filed a Notice of Foreign Law Pursuant to Chancery

---

[34] Post-Trial Report Tr. at 68:21-22.

[35] *Id*. at 68:24-69:6; *see also* Defs.' Pre-Trial Ans. Br [hereinafter, "AB"], Ex. E at 1, Dkt. 38 (emphasis added).

[36] Dkt. 21 at 6.

[37] *Id*. ¶ 3(d); *id*. ¶¶ 3(f), 8.  The reference to "paragraph (f)" appears to be a typo intended to mean Paragraph 3(d).

[38] Dkt. 33 ¶ 13.

Rule 44.1, stating that TAG intended to introduce the corporate law of the Republic of Cyprus.[39]

On July 26, 2023, Plaintiff filed a Motion in *Limine* to Bar Evidence Regarding Cyprus Law.[40] On August 3, 2023, I issued a letter report granting that motion because "TAG ha[d] not demonstrated good cause why it should be permitted to advance th[e expert] opinion" after the discovery deadline and because TAG's Rule 44 disclosure was untimely.[41] The August 3, 2023 letter report warned that "[t]o litigate efficiently under a summary schedule, the parties need to cooperate with one another to tee up issues for resolution" because "[t]here isn't time for 'overly aggressive litigation strategies' and games of 'gotcha.'"[42]

TAG failed to heed that warning. Instead, it leveled up its aggressive tactics. At 11:15 p.m. the night before the pre-trial conference, TAG filed a letter informing the Court that TAG had rescinded Polymath's shares under the Stock Purchase Agreements.[43] TAG claimed "[t]his raise[d] a substantial question as to whether the

---

[39] Dkt. 30, Ex. A.

[40] Dkt. 33.

[41] Post-Trial Report Tr. at 71:24-72:8; *PVH Polymath Venture Hldgs. Ltd. v. TAG Fintech, Inc.*, C.A. No. 2023-0502-BWD, at 5 (Aug. 3, 2023), Dkt. 37.

[42] *Id.* (quoting *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *30 (Del. Ch. Nov. 24, 2020) (footnotes omitted).

[43] Dkt. 43 at 2.

rescission of those shares render[ed] Plaintiff's claim moot[,]" and requested that trial be postponed to permit discovery into this new argument.[44]

TAG's delay tactic was rejected at the pre-trial conference the next morning because:

> The authority issues that were raised in the letter that was filed last night are the same issues that were raised in the company's notice of foreign law that was filed back on July 25th. So the decision to take this action and file a letter at 11:15 p.m. on the eve of the pretrial conference and one week before the trial certainly appears to me to be strategic and not a good faith effort to provide the other side with notice of the relevant issues for trial.[45]

During the pre-trial conference, the parties could not agree on whether to present live testimony at trial the following week.[46] Plaintiff argued that the

---

[44] *Id.*

[45] *PVH Polymath Venture Hldgs. Ltd. v. TAG Fintech, Inc.*, C.A. No. 2023-0502-BWD, at 23:3-12 (Aug. 17, 2023) (TRANSCRIPT) [hereinafter, "Aug. 17, 2023 Tr."], Dkt. 52; *see also id.* at 23:13-24:9

> The argument that's presented in that letter is that Polymath breached a representation in its purchase agreement with TAG, which gives TAG the right to rescind the agreement or otherwise voided the agreement, and, as a result, Polymath no longer has standing to seek books and records under Section 220. Any standing argument is waived given that TAG could have raised this argument nearly a month ago but didn't. . . . There are also legal issues that haven't been briefed, like the impact of purportedly losing stockholder status after a Section 220 complaint has been filed. My understanding under the case law is that the relevant inquiry is whether a plaintiff is a stockholder at the time of the complaint, not whether they lose stockholder status after the complaint is filed. I'm not ruling on that issue because the argument is waived, but that is my understanding of the case law.

[46] *Id.* at 24:12-25:9.

10

Scheduling Order, which required the parties to "[e]xchange lists identifying potential witnesses each party may introduce at trial through affidavit, if any," precluded the presentation of live witnesses.[47] TAG insisted that the Scheduling Order did not explicitly preclude the presentation of live witnesses even though TAG still had not identified any witnesses.[48] After additional briefing and another status conference, trial was briefly postponed to accommodate the exchange of witness lists and depositions.[49]

---

[47] *Id.* at 10:11-17.

[48] *Id.* at 15:1-24; *see also id.* at 16:15-17:12

> [W]hen are you going to let the Court know and the other side know what witnesses are going to be presented? I mean, we're at the pretrial conference, and I'm hearing that you are not sure which witnesses are going to testify. There is a reason that parties negotiate a case schedule that anticipates the exchange of witnesses. The way I interpret the case schedule here is that witnesses were supposed to be exchanged back in June, on June 19th. So we're one week before trial, and I'm hearing that the parties haven't agreed on a list of witnesses. That doesn't make sense to me. I understand the company's interpretation of this schedule is that at the time it was being negotiated, the plaintiffs were pushing for a trial on a paper record and the company wanted live witnesses. But it's not a reasonable interpretation of this schedule that if the parties couldn't agree on whether or not there would be live witnesses, then the company could wait until the day before trial or show up the day of trial and identify their witnesses. That's not how litigation works.

*See also id.* at 18:7-10 ("[A]nother problem with the parties not exchanging witness lists in June is that now whichever witnesses are identified, the plaintiffs don't have an opportunity to depose them.").

[49] Dkts. 45, 47-49.

11

### E.  The Trial

On September 28, 2023, the Court held a one-day trial.[50]  Two fact witnesses testified.  Plaintiff also produced a third witness to authenticate documents because TAG refused to stipulate to the authenticity of most documents.[51]  Despite conceding the propriety of Plaintiff's purpose for the Demand, TAG spent most of its trial time putting on merits-based defenses to the allegations of wrongdoing raised in the Demand.

On October 9, 2023, the Court heard oral argument in lieu of post-trial briefing.[52]  After the argument, I issued an oral post-trial report (the "Post-Trial

---

[50] Dkt. 58.

[51] *PVH Polymath Venture Hldgs. Ltd. v. TAG Fintech, Inc.*, C.A. No. 2023-0502-BWD, at 87:10-88:20 (Sept. 28, 2023) (TRANSCRIPT) [hereinafter, "Sept. 28, 2023 Tr.], Dkt. 60

> THE COURT: [L]et me just ask you, the documents that were just authenticated by Mr. Muktar, it strikes me that most, if not all, of those documents would likely be in the possession or the custody of the company. So I just wanted to ask you, what efforts, if any, did the company take to confirm whether copies of these documents resided in their records before the company determined whether to stipulate to the authenticity of those documents?
>
> [COUNSEL]: I cannot answer the question directly.  I don't have a direct answer.  What I can say is these documents were produced in discovery. . . .
>
> THE COURT: What I'm trying to understand is whether the company has any basis to challenge the authenticity of these documents, given that it seems very likely to me that the company has copies of these documents. . . .  I'm trying to understand . . . whether the parties made a good-faith effort to stipulate to the authenticity of these documents or if this was really just a tactic to impose additional costs in these proceedings.

[52] Dkt. 58.

Report"), concluding that Plaintiff was entitled to inspect certain categories of TAG's books and records.

The Post-Trial Report found that Plaintiff had met its burden to establish Gupta's authority to make the Demand on behalf of Polymath[53] and that Plaintiff's purposes for making the Demand were proper.[54] The Post-Trial Report further found that the Second Injunction did not foreclose inspection of TAG-Pakistan's books and records, explaining:

> Courts in and outside of Delaware have, on several occasions, addressed whether parties to litigation in the U.S. can obtain relief from document production obligations by invoking foreign laws. The case law, including the U.S. Supreme Court's decision in *Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522, makes clear that an American Court has the power to require a party to produce documents in accordance with its rules or laws, although the court must make a discretionary determination about whether to do so on the facts of the case.
>
> In *In re Activision Blizzard, Inc*., 86 A.3d 531, . . . Vice Chancellor Laster followed the principles set out in *Aérospatiale* and the

---

[53] Post-Trial Report Tr. at 71:1-18; *see also id*. at 73:7-76:6

> I find that plaintiff has met his burden to demonstrate that Gupta was authorized to make the demand on Polymath's behalf, and the failure to produce a formal board resolution authorizing the demand or initiation of this lawsuit does not alter that conclusion. As numerous cases from this Court make clear, a stockholder plaintiff seeking books and records under Section 220 is not required to produce written proof, such as a formal board resolution, evidencing its authority to make the demand. . . . Based on all of the authority that I just cited, the credible testimony presented at trial is sufficient to satisfy the plaintiff's burden to demonstrate that Mr. Gupta was authorized to act on behalf of Polymath to make the demand.

[54] *Id*. at 76:7-79:19.

13

Restatement (Third) of Foreign Relations Law. Section 442 of the Restatement makes clear that a Delaware Court may order a person subject to its jurisdiction to produce documents, even if the information is outside of the United States, and that the failure to comply may result in sanctions.[55]

Guided by the principles outlined in *Activision* and Section 442 of the Restatement,[56] the Post-Trial Report explained that "[f]our of the five factors set forth in Section 442 of the Restatement weigh[ed] heavily in favor of requiring a books and records production notwithstanding the [Second Injunction]."[57] The Post-Trial Report also

---

[55] *Id.* at 82:12-83:13.

[56] *Id.* at 83:17-84:6

> (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

(quoting *In re Activision Blizzard, Inc.*, 86 A.3d 531, 541 (Del. Ch. 2014)).

[57] *Id.* at 84:22-85:1; *see also id.* at 85:2-24

> On the first factor, the documents ordered to be produced are not only important to the litigation—they are, in fact, the final relief sought in this books and records proceeding. So, in other words, this whole matter is about documents. As to the second factor, in crafting a final order, I must order production only of those documents that are necessary and essential to accomplishing the proper purposes stated in the demand. So the documents ordered to be produced will be specific. On the fourth factor, there are no alternative means available for accessing this information. On the fifth factor, Delaware has a paramount interest in enforcing the statutory rights of stockholders in Delaware corporations under the Delaware General Corporation Law, including the right to access books and records under Section 220. It's not clear if the third factor, whether the information

14

considered whether TAG had made a good faith effort to secure permission from the Pakistan District Court to make the documents available, but found the opposite—that TAG had "not made a good faith effort to seek relief from the Pakistani injunction," and it was "highly likely that Mr. Gondal caused or coordinated with his brother to seek the first injunction, and following my ruling on the motion to compel, caused or coordinated the withdrawal of the first injunction to seek a clarified order with the second injunction."[58]  The Post-Trial Report concluded that TAG could not withhold TAG-Pakistan's books and records based on the Second Injunction, but in the interest of judicial economy, it afforded TAG an additional fourteen days from entry of a final order to seek relief from the Pakistan District Court.[59]

---

originated in the United States, favors production of the documents, but all other factors clearly do.

[58] *Id*. at 86:11-18; *see also id*. at 86:19-87:5

I note that Talal Gondal is the CEO of TAG-Pakistan, oversees litigation at TAG-Pakistan, is relying on the advice of TAG-Pakistan's Pakistani counsel in determining not to violate the injunction, and is represented by the same counsel as TAG-Pakistan and Ijlal Gondal in other pending litigation.  Mr. Gondal testified that he has not discussed the Pakistani injunctions with his brother, but I do not find that testimony credible.  And neither TAG nor TAG-Pakistan opposed either injunction.

[59] *Id*. at 87:6-11.

15

At trial, Plaintiff sought an award of costs and attorneys' fees.[60]  The Post-Trial Report permitted Plaintiff to move for attorneys' fees within thirty days.[61]

### F.    The Motion to Enforce

On October 19, 2023, the Court entered a Final Order and Judgment (the "Final Order") implementing the Post-Trial Report.[62]

Six days later, on October 25, 2023, Plaintiff moved to enforce the Final Order, complaining that TAG had not produced bank statements required by the Final Order (the "Motion to Enforce").[63]  The next day, TAG agreed to permit Plaintiff to inspect bank statements in person at TAG's Abu Dhabi office.[64]  Plaintiff objected to an in-person inspection, but on November 1, 2023, sent a representative to inspect printed bank records in person in Abu Dhabi.[65]

---

[60] *Id*. at 93:18-94:1 (arguing fee-shifting was warranted because "TAG unnecessarily prolonged production of documents in response to Plaintiff's inspection[,] knowingly asserted frivolous claims," "wrongfully refused Plaintiff's inspection rights, refused to produce a single document, and forced Plaintiff to bring this litigation at significant expense").

[61] *Id*. at 94:2-7.

[62] Dkt. 63.

[63] Dkt. 65 at 2.

[64] Dkt. 68, Ex. A at 1, 3.

[65] *See* Nov. 13, 2023 Tr. at 7:16-8:3

> TAG explains that notwithstanding plaintiff's request for an electronic production of bank account records, TAG insisted on plaintiff sending a representative to TAG's offices in Abu Dhabi because, in TAG's view, Section 220 anticipates copying and inspection in the corporation's physical offices.  TAG doesn't suggest that it would have been burdensome to send an electronic copy of the production or offer any justification whatsoever for

Later that day, TAG filed an opposition to the Motion to Enforce, claiming the motion was moot.[66] On November 6, 2023, Plaintiff filed a reply, explaining that TAG still had not produced bank records from newly discovered accounts.[67] On November 9, 2023, TAG filed a sur-reply, blaming Plaintiff for TAG's failure to produce account statements required under the Final Order.[68] At a hearing on November 13, 2023, I granted the Motion to Enforce[69] and shifted fees incurred in

---

increasing the burden on plaintiff other than TAG thinks it has a right under the statute to insist on in-person inspection.

*See also id*. at 11:2-5 ("[T]he fact that TAG insisted that plaintiff send a representative in person to its offices in Abu Dhabi to inspect the books and records is concerning.").

[66] Dkt. 67 ¶ 3.

[67] Dkt. 71 ¶ 16.

[68] Dkt. 74 ¶ 5.

[69] *See* Nov. 13, 2023 Tr. at 9:24-10:18

[P]laintiff has identified several categories of documents required to be produced under the final order and judgment that have not yet been produced. TAG's explanation for why some of those documents, including certain bank account statements, have not been produced does not justify its noncompliance with the final order. For example, TAG points the finger at plaintiff's representative and suggests that the representative should have asked for a more comprehensive set of bank records when he came to inspect the documents at TAG's offices in Abu Dhabi. That's wrong. TAG is obligated to produce all of the documents listed in the final order and judgment. It's not the obligation of plaintiff's representative conducting the inspection to ask whether TAG has additional bank records that it's withholding. Those documents are required to be produced under the final order.

17

connection with that motion,[70] but declined to appoint a receiver to coerce compliance with the Final Order at that time.[71]

### G. The Fee Motion

On November 29, 2023, Plaintiff filed its Motion for an Award of Attorneys' Fees and Expenses (the "Fee Motion").[72] On December 15, 2023, TAG filed its Opposition to Plaintiff's Motion for an Award of Attorneys' Fees and Expenses.[73] On January 26, 2024, Plaintiff filed a reply in further support of the Fee Motion.[74]

## II. ANALYSIS

Plaintiff seeks an award of fees and costs incurred in connection with this litigation. "Delaware courts follow the American Rule that 'each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation.'" *Pettry*, 2020 WL 6870461, at *29 (quoting *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017)). An exception exists in equity, however, when a party litigates in bad faith.

---

[70] *See id.* at 12:14-18 ("Plaintiff is entitled to its reasonable fees incurred in connection with this motion, which TAG mooted in part by permitting inspection of some documents at its offices and which prompted TAG to request additional bank records from TD Canada.").

[71] *See id.* at 13:2-5 ("I'm going to defer ruling on the request for appointment of a receiver and, instead, I'm going to order the parties to meet and confer on the outstanding requests by the end of this week.").

[72] Dkt. 82.

[73] Def.'s Opp'n To Pl.'s Mot. For An Award Of Attorneys' Fees And Expenses [hereinafter, "Opp'n"], Dkt. 85.

[74] Dkt. 87.

*Rice v. Herrigan-Ferro*, 2004 WL 1587563, at *1 (Del. Ch. July 12, 2004). This Court has recognized that in "extraordinary circumstances," "overly aggressive litigation strategies" employed to improperly resist a books and records demand may warrant fee-shifting. *Pettry*, 2020 WL 6870461, at *29-30 (citation and internal quotation marks omitted). A party seeking to shift fees must satisfy "the stringent evidentiary burden of producing 'clear evidence' of bad faith . . . ." *Dearing v. Mixmax, Inc.*, 2023 WL 2632476, at *5 (Del. Ch. Mar. 23, 2023) (ORDER) (quoting *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005)). To warrant fees, a litigant's conduct must be "glaring[ly] egregious." *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023). Regrettably, TAG's conduct throughout this litigation rises (or sinks) to the level of glaring egregiousness.

Despite conceding that Plaintiff stated a proper purpose for making the Demand,[75] TAG refused to produce documents in response, forcing Plaintiff "to file suit to 'secure a clearly defined and established right[]'" to inspect books and records. *Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *1 (Del. Ch. July 22, 2021) (quoting *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000)).

---

[75] Post-Trial Report Tr. at 70:2-10; Opp'n ¶¶ 4-5.

Rather than consider Plaintiff's Demand in good faith, TAG asserted that Gupta lacked authority to make the Demand on behalf of Polymath under Cyprus law, insisting that live testimony was needed to resolve this issue at trial.[76] The defense was pretextual; TAG's principals knew Gupta personally and had negotiated with him directly when Polymath invested in TAG.[77]

TAG also tried to evade its statutory obligation to produce books and records by hiding behind foreign injunctions that, at best, TAG's principals made a strategic decision not to oppose, and at worst, they colluded to obtain.[78] TAG blocked relevant discovery on that basis, as well.[79]

TAG then claimed in briefing and at trial that "there [we]re no documents responsive to the requests [in the Demand] that ha[d] not already been produced (save for those subject to the Pakistan Injunction)."[80] TAG's position was demonstrably false, and TAG continued to withhold responsive documents even after entry of the Final Order.[81]

---

[76] *See* Post-Trial Report Tr. at 71:19-23; Opp'n ¶ 9.

[77] *See* n.53, *supra*.

[78] *See* n.58, *supra*.

[79] *See Seidman*, 2023 WL 4503948, at *7 (shifting fees where, among other conduct, the defendant "took aggressive positions in discovery"); *Pettry*, 2021 WL 3087027, at *2 (same).

[80] *See* Sept. 28, 2023 Tr. at 113:12-114:11; *see also* AB at 16.

[81] *See Myers v. Acad. Sec., Inc.*, 2023 WL 6380449, at *2 (Del. Ch. Oct. 2, 2023) (shifting fees where the defendant raised baseless defenses designed to deprive plaintiff of his inspection rights), *R&R adopted*, 2023 WL 6846984 (Del. Ch.); *Martin v. Med-Dev Corp.*,

Throughout the litigation, TAG also sought to needlessly complicate and delay the proceedings,[82] including by (1) producing an expert opinion attempting to inject new issues under Cyprus law after the discovery deadline;[83] (2) purporting to unilaterally cancel Plaintiff's shares on the eve of the pre-trial conference and seeking to postpone trial on that basis;[84] (3) insisting on the presentation of live testimony at trial when, under the circumstances, the disputed issues could easily have been resolved on the papers;[85] (4) refusing to stipulate to the authenticity of most documents at trial;[86] and (5) requiring Plaintiff to inspect the Company's books and records in person in Abu Dhabi.[87]

---

2015 WL 6472597, at *21 (Del. Ch. Oct. 27, 2015) (explaining that a party's "dogged pursuit of . . . borderline frivolous or near frivolous [issues] me[t] th[e] standard [for bad faith] because it utterly lacked any legal or factual bases").

TAG argues that it "had a good faith basis in law and fact for asserting its defenses." Opp'n ¶ 6. In *Gilead*, the Court rejected a similar argument that the defendant "vigorously defended the lawsuit . . . on the 'good-faith belief that the case law and factual record developed through discovery supported its arguments[,]" explaining that "this court has shifted fees based on litigation conduct without launching a fact-intensive investigation into the offending party's state of mind. . . . [W]here this court shifts fees to curb and correct for overly vexatious litigation behavior, a showing of glaringly egregious litigation conduct is enough." *Pettry*, 2021 WL 3087027, at *2 (footnotes and internal quotation marks omitted).

[82] *Id.* at *1 (quoting *RBC Cap. Mkts., LLC v. Educ. Loan Tr. IV*, 2016 WL 703852, at *3 (Del. Super. Feb. 17, 2016)).

[83] *See* n.38, *supra*.

[84] *See* n.43, *supra*.

[85] *See* n.48, *supra*.

[86] *See* n.51, *supra*.

[87] *See* nn.64-65, *supra*.

21

These positions, taken together, are glaringly egregious and warrant fee-shifting. *See Myers*, 2023 WL 6380449, at *2 (shifting fees where the defendant's litigation strategies, in the aggregate, "reflect[ed] an unfortunate pattern of unreasonable positions designed to unnecessarily complicate the proceedings"); *Auriga Cap. Corp. v. Gatz Props*., 40 A.3d 839, 881 (Del. Ch. 2012) (shifting fees where, "[r]ather than focus on only bona fide arguments, [defendant] and his counsel simply splattered the record with a series of legally and factually implausible assertions" in a strategy to "exhaust" the plaintiffs), *aff'd sub nom. Gatz Props., LLC v. Auriga Cap. Corp*., 59 A.3d 1206 (Del.); *see also Pettry*, 2021 WL 3087027, at *2 (noting that "[p]erhaps one of these positions, standing alone, could be forgiven as merely an aggressive defense," but "collectively, these positions rise to the level of glaringly egregious litigation conduct").

Having concluded that fee shifting is warranted under the circumstances, I consider the reasonableness of Plaintiff's fee request.

> "Delaware law dictates that, in fee shifting cases, a judge determines whether the fees requested are reasonable." The Court "has broad discretion in determining the amount of fees and expenses to award." The Court reviews a fee application pursuant to the factors set forth in Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct. "Determining reasonableness does not require that this Court examine individually each time entry and disbursement." Nor does it "require the Court to assess independently whether counsel appropriately pursued and charged for a particular motion, line of argument, area of discovery, or other litigation tactic." "For a Court to second-guess, on a hindsight basis, an attorney's judgment" as to whether work was

22

necessary or appropriate "is hazardous and should whenever possible be avoided."

*Seidman*, 2023 WL 4503948, at *8 (citations and footnotes omitted). TAG does not dispute the reasonableness of the fees and expenses set forth in the Affidavit of Jody C. Barillare in Support of Plaintiff's Motion for an Award of Attorneys' Fees and Expenses (the "Affidavit"). Those fees, I find, "are within the range of what a party reasonably could incur over the course of . . . pursuing an adversary engaged in a 'mix of open defiance, evasion and obstruction.'" *Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010) (citation omitted).

Accordingly, Plaintiff is entitled to fees and expenses in the amount set forth in the Affidavit.[88]

## III. CONCLUSION

For the reasons explained above, the Fee Motion is granted. The parties are directed to submit an appropriate form of implementing order.

---

[88] On January 10, 2024, I entered with modifications an Order Granting Plaintiff's Rule 88 Request for Fees and Costs Incurred in Connection with Polymath's Motion to Enforce § 220 Order (the "January 10 Order"). *See* Dkt. 86. The January 10 Order stated that the Court would consider Plaintiff's request for $8,562 incurred in connection with the meet-and-confer process and $734.50 incurred for an attorney to physically appear at TAG's Abu Dhabi offices as part of the Fee Motion. *Id.* at 3. I have considered the reasonableness of those fees and determined that they also should be included within the amount of fees and expenses to which Plaintiff is entitled.